# WELLS *v.* SAVANNAH.

ERROR TO THE SUPREME COURT OF THE STATE OF GEORGIA.

No. 222.   Argued April 9, 1901.—Decided May 13, 1901.

Payment of taxes on account of property otherwise liable to taxation can only be avoided by clear proof of a valid contract of exemption from such payment.

The validity of such a contract presupposes a good consideration therefor.

In this case the ordinances exempting from taxation were only exemptions for the year in which the ordinance was passed; and the same rule applies to all the exempting ordinances.

The views of the Supreme Court of Georgia in this case are sustained by this court.

THE plaintiffs in error commenced this proceeding in the superior court of the State of Georgia, Chatham County, against the mayor, etc., of the city of Savannah and its city marshal, to enjoin the collection of taxes upon certain real estate in that city, of which they claim to be lessees from the city, and they allege that the taxes assessed upon such real estate are illegal; they also seek to recover from the city the amount of taxes theretofore paid by them on such real estate, under protest. The trial of the case resulted in a judgment for the city, which was, on appeal to the Supreme Court of the State, affirmed, and the plaintiffs have brought the case here on writ of error.

They claim that the levying and collection of the taxes referred to, under an ordinance of the city providing therefor, passed in 1878, constitute an impairment of the obligations of a contract between the city and the predecessors in title of the plaintiffs in error, made at the time the real estate was purchased, by which contract it was agreed that on the payment of a certain annual sum, called "ground rent," to the city by the holders of the real estate, it was to be forever exempt from all city taxation.

Upon the trial of the action these facts appeared: Prior to

1790 the city of Savannah owned certain lots which were called " common lots," and on September 28 of that year the common council passed an ordinance for disposing of a portion of them. Each lot, by the provisions of the ordinance, was to be valued by the city, and then put up for sale at public outcry, and the highest bidder, over and including the original valuation, was to have the lot, and if he chose to pay the whole amount of his bid in cash he was to have a deed conveying it to him in fee simple, or he might, instead of making the whole cash payment, agree with the city to pay in cash the balance of his bid over the valuation, called the increase money, and also to pay a ground rent of five per centum upon the amount of the valuation, payable quarterly, and in that event the lot might be retained in his hands or in the hands of his heirs and assigns forever on payment of such ground rent. The ordinance further provided that at any time thereafter the purchaser or his heirs or assigns should have the power to pay the original valuation money, with what rent might be due up to that time, in full discharge and extinguishment of the ground rent, and he or they should thereupon be entitled to the land in fee simple. The city was also to give a deed by way of bargain and sale to each purchaser of lots which should vest an absolute or conditional estate in the purchaser, according to the circumstances; that is to say, an absolute one if the valuation and increase money should be paid down, or a conditional one if the valuation money should not be paid down, but which should become absolute if and when the valuation money should at any future time be paid into the treasury, which payment should be acknowledged by the mayor and a majority of the aldermen, under the seal of the city and attested by the city treasurer, to be endorsed on the deed. The ordinance continued:

"And the said conditional estates shall amount to this, that the use and occupation of the premises are forever secured to the purchaser and others claiming under him or her on payment of the ground rent, but on failure therein for the space of fifteen days after the same shall become due the said premises are to revert to the corporation, who shall immediately thereafter possess the power of reëntry, and having by means of

their proper officers exercised such power and given a notice thereof in writing posted on the premises, the lot or lots so entered upon, with all improvements thereon, are to be considered at the expiration of ten days thereafter as absolutely revested in the corporation, and the conditional estate therein determined, to all intents and purposes, as fully as if the same had not been bargained for or purchased, any sale or incumbrance or other act, made or suffered by the purchaser or purchasers or others under him, her or them, to the contrary thereof in anywise notwithstanding."

Pursuant to such ordinance the lands were sold and the purchasers of many of the lots elected to hold their purchases on ground rent payable quarterly, as stated in the ordinance. Deeds were thereupon executed on the part of the city and also were signed by the respective purchasers. Lands have been sold from time to time under ordinances of substantially the same character and containing language in substance the same up to 1872, since which time conditional sales have been abandoned.

The deeds contained a provision that "In consideration of the rent to be paid, and of the several covenants and agreements to be performed, (mayor and aldermen,) have bargained and sold, and by these presents do bargain and sell, unto the said ——— ——— all that lot of land (describing it) . . . unto the said ——— ——— executors, administrators and assigns, forever, on this express condition. Nevertheless, that ——— ——— the said ——— ——— executors, and administrators and assigns," shall pay rent as covenanted; and "in case of failure herein for the space of twenty days after any of the said quarterly payments shall become due, that then the said lot and premises shall revert to the corporation of the said city, who shall immediately thereafter possess the power of re-entry; and having, by means of their proper officers, exercised such power, and given a notice thereof in writing, posted on the premises, the said lot, with all improvements thereon, shall be considered, at the expiration of ten days thereafter, as absolutely revested in the corporation, and the estate by these presents created determined to all intents and purposes as fully

as if the same had not been bargained for or purchased; any sale or incumbrance, or other act made or suffered by the said ——— ——— executors, administrators or assigns, or others under him or them, to the contrary thereof in anywise notwithstanding."

The purchaser also covenanted to pay the annual rent, and that in case of failure the city should have the lawful right of reëntry as already provided for.

The deed also contained the following provision:

"And it is hereby declared to be the true intent and meaning of these presents, and all parties to the same, that, on payment of the said ground rent, at the times and after the manner hereinbefore directed, the said ——— ——— heirs, executors, administrators and assigns, shall and may from time to time, and at all times hereafter, peaceably and quietly have, hold, use, occupy, possess and enjoy the said lot and premises, and receive and take the rents, issues and profits thereof, and of every part thereof, to ——— and ——— own use, absolutely, without the let, suit, trouble, eviction or denial of the said corporation or of any person whatsoever acting under them or by virtue of their authority, subject only to such assessments and burthens as shall be in common with other lotholders in the said city."

It was also provided in the deed that the purchaser, his heirs, executors or administrators or assigns, might at any time pay into the city treasury the valuation money and the rent then due, in full discharge and extinguishment of such rent, and in that case there should be an acknowledgment of such payment under the seal of the city, signed by the mayor and a majority of the aldermen and attested by the city clerk, and indorsed on the deed, "which shall then and from thenceforth vest an absolute estate, in fee simple, of and in the said lot and premises, in the said ——— ——— heirs and assigns to ——— and their only proper use and behoof forever." It is admitted that the same character of deed has been executed for lots sold under other sales since 1790.

Extracts from the minutes of the proceedings of the common council of the city, in regard to meetings of that body in 1790

and thereafter, were put in evidence, from which it appeared that the ordinance for the sale of these lots was induced by the fact that the expenses of the city government were more than its revenues, and these sales were provided for in the hope that the condition of the city's finances might thereby be improved. There was also put in evidence a notice of sale of lots, advertised in The Georgia Gazette of June 13, 1799, in which were specified the terms contained in the ordinance for the sale of the lots, and the advertisement contained the statement that the "purchasers are at liberty to take a lease to him or her or his heirs and assigns forever of the lots so purchased, at a ground rent of five per cent on the valuation," etc.

An ordinance for laying off into city lots what was called the " Springfield Plantation," and providing for the sale of the same, passed in the year 1851, was also put in evidence, which contained substantially the same plan as that provided for in the ordinance of September 28, 1790, except that the conditional sale was to be for twenty-four years only. Although the lots mentioned in the petition of the plaintiffs in error in this case are not situated within the Springfield Plantation, the ordinance and the deed thereunder regarding those lots were put in evidence for the purpose of comparison with the ordinance of 1790, and the deeds executed thereunder, in order to show that the same language, except as to the term, was used in the instrument which granted a lease for but twenty-four years as was used in the other granting a perpetual term. There were also ordinances of February 27 and July 31, 1851, put in evidence, the former of which permitted one of two or more tenants in common or joint tenants to pay his proportion of the purchase money, and, upon such payment, he should receive a deed in fee, and any lessee of a city lot might, on application, have it divided into two or more parts and receive a lease for the same; and the other ordinance provided for increasing the depth of certain lots, at an increased rent therefor, payable at the same time that the regular ground rents on these lots fell due.

A report of the mayor in 1854, to the common council, was put in evidence, in which was a statement of the resources of

the city of Savannah, among which were designated 643 lots in 22 wards "under lease;" also two reports of the mayor, the one on October 31, 1855, and the other a year later, both containing similar statements as to the number of lots belonging to the city, which were "under lease," and similar reports from and including 1857, up to and including 1877, with the exception of the years 1864 and 1865, when no report was made by the mayors of the city. This class of evidence was offered for the purpose of showing that the title conveyed to the purchasers was under a lease, and that it was not a conditional estate subject to be terminated by a breach of a condition subsequent, and that the city recognized the conveyance as a lease and not in truth as a conditional estate.

On April 7, 1806, an ordinance was passed by the city council for raising a fund for the support of a "watch" in the city, which provided that a tax should be levied on property therein, "including all lots held by lease from the corporation," but on November 24, 1806, an ordinance was passed providing "that so much of the first section of the aforesaid ordinance as imposes a tax on lots held by lease from the corporation . . . be and the same is hereby repealed."

It was admitted that every annual tax ordinance to raise revenue for the city passed by the mayor and aldermen from the above date, November 24, 1806, up to and including the ordinance of January 22, 1857, used the words "excepting lots held by lease from the corporation." On December 11, 1857, the tax ordinance provided as follows:

"Sec. 4. The following real property shall be exempt from taxation, to wit: each lot of land held at the time of the passage of this ordinance upon the payment of ground rent to the mayor and aldermen, of the class commonly called city lots."

The annual report of the mayor for the year 1871 was also put in evidence, in which the following language occurs: "It is not known to the foreign public that a very large part of the real estate in the city consists of lots sold on condition of the payment of ground rent, and are, therefore, not the subject of taxation, and are not included in the assessments."

It was also admitted that lots known as "ground rent lots"

were never in fact assessed for taxation from 1790 until some time after the passage of the ordinance of May 29, 1878, and that those lots were omitted from the assessment books made in 1807 and every year thereafter down to the assessment book made out in the year 1878, and that in fact no city taxes were ever levied on them until after the resolution of the common council of November 17, 1889, under which they have been for the first time assessed for city taxation for the year 1890.

It was also admitted that no taxes were in fact assessed or levied under the ordinance of April 7, 1806, above mentioned. The holders of these city lots have always paid state and county taxes and street improvements and assessments for sidewalks and all other assessments and burdens common to lot owners in the said city, except city taxes. A report of the finance committee made in 1872, and signed by the chairman, was also put in evidence, in which it was stated as follows:

"The reason why city lots are not taxed beyond the ground rent is that the city is understood to have bound itself not to tax them.

"The ordinance of 1790, which was the first to provide for the sale of lots on these terms, contains a stipulation that the purchaser of such a lot, and all claiming under him, shall have the use, etc., upon paying the ground rent. This ordinance has been followed either in terms or substance by all succeeding ordinances providing for such sale.

"It is of no moment that the stipulation does not appear in the deeds; the ordinances contain the real terms of the contracts and control the deeds whenever the latter depart from them or conflict with them. And as the city has never taxed such lots, it is difficult to resist the conclusion that such was the design when the ordinance of 1790 was framed."

The ordinance of May 29, 1878, provided that—

"Every person and corporation owning real property in said city, including improvements, shall pay a tax upon said property of two and one half per centum of the value thereof, including ground-rent lots, except on such property as may be exempt from taxation under the laws of this State."

The city is given full power of taxation by state legislation. Code of 1863, sec. 4756; Code of 1882, sec. 4847.

Oral evidence was also given from which it appeared that on sales of the property under various ordinances of the same nature as that of 1790 the city marshal by whom the sales were made " would announce that so long as the lots were held under ground-rent plan they would be free from city taxes. These announcements were made under authority of the committee. And often when the bidding would lag the marshal would remind the bystanders that there was only a twenty per cent cash payment required, and that there was no city taxes, but only an annual ground rent."

One of the witnesses, who was himself at the time of some of the sales an alderman between 1858 and 1869, stated:

" I, as a city official, in good faith, have made the statement and directed the marshal so to announce when making sales of city lots under my supervision as chairman of the committee on public sales and city lots, and under the common and universal construction of the city deeds, the absence of any reservation of a right to tax the lots sold under ground rent has always been construed as an agreement not to tax."

Another witness said that he would not say that the city of Savannah ever at any time formally agreed not to tax ground-rent lots; he did not know of any official action taken thereon by the city.

The above are substantially the facts upon which the contention of the plaintiffs in error that their lots are exempt from city taxation is founded. There is no evidence that any of them bought their lots at a sale where an announcement of exemption was made, or that they purchased them under the belief that they were forever legally exempt from all city taxation.

They also claimed that the deed itself, irrespective of the above testimony, necessarily and by its terms implies a perpetual exemption from all city taxation upon the lots so long as the ground rent is paid.

*Mr. Pope Barrow* and *Mr. Joachin R. Saussy* for plaintiffs in error.

*Mr. Samuel B. Adams* for defendants in error.

Mr. Justice Peckham, after making the above statement of facts, delivered the opinion of the court.

The contention on the part of the plaintiffs in error is that, in the exercise of the taxing power granted it by the legislature, the common council of the city adopted the ordinance of May, 1878, and in providing therein for the taxation of the leased lots it thereby impaired the obligation of the contract existing between the city and the holders of that class of property, among whom are the plaintiffs in error, and the ordinance is therefore to that extent void. This contract they say is evidenced, first, by the ordinance of 1790 and the deeds executed in pursuance of its provisions; also by the minutes of the common council of the city and by subsequent proceedings of the common council; by the statements of the city officials at the time when some of the sales of the property were made; by the reports of the officials, mayors of the city and committees of the common council; by the actual omission for a hundred years—from 1790 to 1890—to tax these lots; also by ordinances similar to that of 1790 for the sale of lots, passed subsequently to that year, and by the deeds executed pursuant to such ordinances, which, it is admitted, were in substance similar to those executed under the ordinance of 1790.

Taking all the foregoing evidence into consideration, including the ordinance of 1790 and the deeds executed under it, we are unable to see that any contract of exemption has been proved. The payment of taxes on account of property otherwise liable to taxation can only be avoided by clear proof of a valid contract of exemption from such payment and the validity of such contract presupposes a good consideration therefor. If the property be in its nature taxable the contract exempting it from taxation must, as we have said, be clearly proved. It will not be inferred from facts which do not lead irresistibly and necessarily to the existence of the contract. The facts proved must show either a contract expressed in terms, or else it must be implied from facts which leave no room for doubt

that such was the intention of the parties and that a valid consideration existed for the contract. If there be any doubt on these matters, the contract has not been proven and the exemption does not exist. ·This has been many times decided by this court. *Tucker* v. *Ferguson*, 22 Wall. 527, 573; *Bank of Commerce* v. *Tennessee*, 161 U. S. 134, 146, and cases cited.

The different annual ordinances for taxation passed by the common council, exempting from taxation thereunder the leased lots, were but exemptions for the year in which the ordinance was passed, and there can be no plausible claim urged that they, one or all, constituted any contract for exemption beyond the time of each specific ordinance. The statements of officials when lots were sold, that they were not taxable, did not constitute a contract. The lots had not in fact been taxed at the time of these statements and had been annually exempted from taxation, and the statements amounted to no more than opinions of officials as to what would be done in the future. There is no evidence that they had the least power to speak for or to bind the corporation in this behalf. The reports of committees that the lots were not taxable are of the same character—merely the opinions of officials upon a question of law, and not in the nature of a contract.

Upon this question of proof of a contract we quote what was said by the Supreme Court of Georgia in this case upon the last review, through Mr. Justice Lewis (107 Ga. 1):

" Was such a contract shown in the present case? With the view of determining whether or not there was, we have naturally looked to the official action taken by the governing body of the city, either in its ordinances or resolutions providing for the plan upon which the sales were to be made and the consequences and effect thereof, or in its deed of conveyance to the purchaser. Upon examining the various ordinances set out in the record we fail to find any reference whatever to the matter of exempting this property from taxation, and instead of finding any stipulation to that effect in the form of deed invariably made by the city to the various purchasers there appears a clause directly negativing the idea that the city ever intended to grant a perpetual exemption of this property

from the burden of taxation. In each instance it was recited
in the deed given to the purchaser that the conveyance of the
city was made and the rights of the purchaser thereunder were
conferred 'subject only to such assessments and burthens as
shall be in common with other lotholders in the said city.'
The term 'assessment' is often used as a synonym of 'taxes.'
Indeed, one of the definitions of this term given by Webster is
'a tax.' But even if this word, as used in the deed, does not
necessarily refer to taxation, the word 'burthen,' which is also
therein employed, is certainly sufficiently comprehensive to in-
clude municipal taxes. Taken all together, the language
adopted is clearly broad enough to embrace every burden then
existing or which might thereafter be lawfully imposed upon
other landowners in the city. The deed was signed by both
parties. Here, then, is a specific written agreement made be-
tween the parties to the contract relating to the sale of prop-
erty by the city, whereby it is expressly declared that the prop-
erty shall be held by the purchaser (and, of course, by his as-
signs) subject to any burden which might be borne in common
by the holders of other lots in the city, necessarily including
that of municipal taxation.

"Plaintiffs in error contend, however, that the contract they
insist upon is evidenced sufficiently by the conduct of the mu-
nicipal officers at the time the sales by the city took place.
It was shown that when lots were put up for sale the city mar-
shal publicly announced that they would not be subject to city
taxes; that this was generally understood by the city at large,
and that for nearly a hundred years after these sales first be-
gan the municipal authorities failed to tax the lands, and in
various ordinances afterwards passed these ground-rent lands
were exempted. The effect of these ordinances was merely to
grant an exemption from taxes for the particular years to which
they related. Mere nonuser by a government of its power to
levy a tax, it matters not for how long it continued, can never
be construed into a forfeiture of the power. This question
was directly passed upon by this court when the case was here
before. As to this point, Chief Justice Bleckley said: 'What-
ever the expectation of purchasers or the unbroken practice of

the city hitherto may have been, the mandate of the constitution of 1877 is to tax all property, save that expressly exempted by the legislature under constitutional authority, if any is taxed. That this mandate may have heretofore been disregarded is no reason why it should not be obeyed now.'

 "There is an absolute want of any testimony in the record showing that the mayor and aldermen of the city of Savannah, by ordinance, resolution or official action of any sort, ever authorized the marshal to make the public announcement above referred to in offering for sale the city's property. . . . Besides all this, we fail to find in the record any testimony showing that these particular plaintiffs or any of their predecessors in title bought any of the lots in question under the impression that the same would be exempt from taxes. Indeed, it is not shown that any of these lots were purchased at a sale at which the marshal made such an announcement as that above referred to. The evidence simply goes to the extent of showing what was his custom in this particular and what was the general impression of the public in regard to the matter. For aught that appears, those who actually bought at these sales were fully advised as to the truth with reference thereto, if not prior to the sale, at least before they complied with their bids and accepted the city's conveyance of the lots purchased by them."

We think the opinion correctly states the facts and the law relating to them.

Looking specially at the contents of the deeds executed under the ordinance of 1790, which were signed by both parties, the city and the purchasers, we find that the provision under which the purchasers took the title and by which they were thereafter peaceably and quietly to have possession of the lots was by positive agreement, " subject to all such assessments and burthens as might be in common with other lotholders in. the city."

Plaintiffs in error endeavor to give to the word " assessments," contained in the deeds from the city, its more modern meaning of a peculiar kind of tax levied upon lands specially benefited by improvements which are to be paid for by such assessments.

The fact is notorious that a century ago special assessments of that kind upon the lands benefited were not usual in this country, and at that time the word was used as synonymous with "rates or taxes," generally. Thus, in a statute passed by the legislature of Georgia in the year 1787, to be found in Watkins' Digest of the Laws of Georgia, 1755–1790, at page 354, it was provided in the fourth section, in speaking of the city of Savannah and the hamlets thereof, " that it shall and may be lawful for the said wardens, or a majority of them, yearly and every year, or oftener, if occasion may require, to make, lay and assess one or more rate or rates, assessment or assessments, upon all or every person or persons who do or shall inhabit, hold, use or occupy, possess or enjoy any lot, ground, house or place, . . . within the limits of the town of Savannah or hamlets as aforesaid, for raising such sum or sums of money as the said wardens, or a majority of them, shall in their discretion judge necessary for and towards carrying this act into execution ; and in case of refusal or neglect to pay such rate and assessment, the same shall be levied and recovered in manner as hereinafter directed."

Here is an instance of the use of the word "assessment" at that time in relation to this very city as descriptive of a general tax upon the owners of property within the limits of the city, and to be expended for the general purposes of the corporation. We agree with Mr. Justice Lewis in his construction of this language contained in the deed.

It is further objected in behalf of the plaintiffs in error that the condition that the land was to be subject to assessments, etc., was inserted in the deeds without the authority of the common council, and that the ordinance of 1790 providing for the sale of lots contained no such provision. We think the deeds are substantially in accord with that ordinance, and there is nothing therein inconsistent or at war with the insertion of such provision in the deed; it was but providing for one of the details connected with the sale, and there was an implied power under the ordinance to do so. In addition to that the purchasers took their deeds with such language contained in them, and having themselves signed the deeds they personally agreed to

the condition, and took their titles subject thereto. We do not by this mean to intimate that the title would not have been equally subject to the condition contained in the deed by accepting the deed while not signing it ; but in addition to the acceptance there is the affirmative act of signing the instrument, and we think the language subjecting the lots to the same assessments and burthens as were laid in common with other lotholders created a valid agreement, and made the lands subject to the same kind of taxation as is levied upon other lots in the city.

The covenant on the part of the city that the purchasers should have peaceable and quiet possession, use, occupation and enjoyment of the lots upon payment of the rent as it became due is in nowise violated by the taxation of the lots in the hands of the purchasers or their assigns. A covenant for quiet enjoyment would not under these circumstances include an exemption from taxation. The purchasers of these lots became to all intents and purposes their owners, as they had the right to their possession, use and occupation forever upon payment of the rent, and they could assign or devise the same, and their assignees or devisees would take good title, and their heirs would also take in case there was no assignment or devise. They could also, at their discretion and on the payment of the money agreed upon, become owners in fee.

Although the city retained the right of reëntry for nonpayment of rent, the character of the title conveyed to the purchasers and their heirs and assigns was not thereby so changed from an absolute fee that the property actually conveyed could not be assessed for the payment of city taxes. The interest of the purchasers was capable of assessment for taxation, and their right was in substance that of ownership. It bears no resemblance to the case of an ordinary lease for years between landlord and tenant.

In reference to this subject, Mr. Chief Justice Bleckley, in his opinion in this case on its first appearance in the Supreme Court of Georgia, (87 Georgia, 397,) at page 399 *et seq.*, said :

" The value of property consists in its use, and he who owns the use forever, though it be on condition subsequent, is the true

owner of the property for the time being. This holds equally of a city lot or of all land in the world. Where taxation is ad valorem, values are the ultimate objects of taxation, and they to whom the values belong should pay the taxes. Land sold or by a contract of bargain and sale demised forever subject to a perpetual rent, is taxable as corporeal property; and in private hands the rent also is taxable as an incorporeal hereditament. The tax on the former is chargeable to the purchaser or perpetual tenant, and on the latter to the owner of the rent. The corporeal property in such case is at the direct risk of the purchaser; he alone sustains the losses of depreciation in value, and he alone takes the benefit of appreciation. The vendor risks only the fixed rent or the fixed purchase money, and neither of these will ever become more or less by anything which may happen to the premises. Only his security, not his property, will be affected thereby. It is to be assumed that the whole contract between the parties will be observed, not broken, and their true relation to the property is to be determined on that assumption. Possession of real estate attended with an indefeasible right to occupy in perpetuity, and also with an indefeasible right to be clothed with the fee upon the voluntary payment of a fixed sum as purchase money, will constitute the purchaser the substantial owner of the property. So long as his possession, supplemented with these rights, continues, he is not a mere lessee but a purchaser admitted into possession on the faith of his contract of purchase. Such were the contracts involved in the present case, and under them the purchasers have the actual possession and use of the premises, with the right to hold forever, on condition of paying up the purchase money whenever they please, and until that time an annual ground rent due by quarterly instalments, the amount of which is fixed by contract, and is the equivalent of interest at a moderate rate *per annum* on the unpaid purchase money. In all essential respects, so far as liability for taxes is concerned, these purchasers are in the position of ordinary purchasers in possession under a bond for title, and these last are chargeable with accruing taxes on lands so held. *Bank* v. *Danforth*, 80 Ga.

55. Not an iota of beneficial ownership in the city lots now in question abides in the municipality. The city but retained a qualified and wholly unproductive title as security for the purchase money and, until that shall be paid, as security also for the annually accruing compensation under the name of ground rents in lieu of interest on that money. If the municipal government held all the values in the city as trustee for the owners, or as security for purchase money, these values would be none the less taxable for that reason. The constitution of the State requires that taxes on property shall be ad valorem, and that when any part is taxed all shall be taxed which is subject for the time being to the taxing power in the given locality. This rule is without exception. It prevails in Savannah. *Mayor & Aldermen of Savannah* v. *Weed,* 84 Ga. 683. The property in question is situate in that city, and, as already said, its beneficial ownership is not in the municipality, but in those who long ago purchased it from the city or who hold under such purchasers by succession to their title. Relatively to the question of taxation, it makes no substantial difference whether the estate or property or beneficial owners be classed as realty or personalty, whatever property of either kind belongs to them is taxable ad valorem. That the so-called ground-rent lots, as long as the conditions of sale are unbroken, are the property of the purchasers follows from what was decided by this court in *Laurence* v. *The Mayor,* 71 Ga. 392, and that case shows that, even after condition broken, the limit of the city's rights would generally be to have all arrearages cleared and discharged, the surplus proceeds realized by a sale of the property being payable to the real owner. Our reasons for the conclusion at which we have arrived need not be further elaborated. The constitution is imperative that property is to be taxed ad valorem. The foundation principle of such a system is that those who own and enjoy values are to pay the taxes. The real owners of the money which these lots would now sell for on the market are the persons whom we have designated as owners, and it is upon the cash market value that taxes are assessable. If that value is any less, on account of the subjection of the property to ground

rents or unpaid purchase money, than it otherwise would be, the fact would no doubt be taken into consideration in making the assessment. The market value, whatever that may be, is the proper basis.

"2. There was no error, either of practice or decision, in denying the injunction. Whatever the expectation of the purchasers, or the unbroken practice of the city hitherto may have been, the mandate of the constitution of 1877 is to tax all property, save that expressly exempted by the legislature under constitutional authority, if any is taxed. That this mandate may have heretofore been disregarded, is no reason why it should not be obeyed now."

We think these views are a correct exposition of the law applicable herein.

We find no element of estoppel in the case. As has been said, the statements of officials made at the time some of the sales may have been effected were nothing more than expressions of opinion, there being no evidence of any agreement on the part of the city or its duly authorized agents to exempt perpetually or at all these lots from taxation for city purposes. The ordinances and the deeds show the transaction and there is no estoppel arising from the language there used. On the contrary, there is evidence of an agreement to pay such taxes.

Such an estate as was created by these deeds does not in our opinion come under the general rule which imposes on a landlord, when the lease is silent upon the subject, the payment of taxes chargeable upon the premises during the term of the lease. Where the purchaser holds real property for a term which may be in perpetuity, upon the condition of paying a certain ground rent, and where he is entitled to a deed conveying the fee at any time on the payment of certain money, he is more nearly described as an owner than he is as a lessee of such property, and he would be liable to pay the taxes imposed upon the property upon the principle which is set forth in *Sanderson* v. *City of Scranton*, 105 Penn. St. 469, and *Delaware &c. Railroad Company* v. *Sanderson*, 109 Penn. St. 583. It is not necessary to decide this question, however, as the specific language

of the deed places the burden of paying the taxes on the purchaser and his grantees.

The judgment of the Supreme Court of Georgia was right, and must, therefore, be

*Affirmed.*